IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CLYDES WINFIELD, | ) | CASE NO. 1:18-cv-01635 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Clydes Winfield ("Plaintiff" or "Winfield") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I. Procedural History

On July 28, 2015, Winfield protectively filed an application for DIB and SSI.[1]  Tr. 16, 107, 137-138, 139, 236-248.  Winfield alleged a disability onset date of May 1, 2015, (Tr. 16,

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 7/16/2019).

236, 243), based on depression (Tr. 107, 139, 171, 180, 297).  After initial denial by the state

agency (Tr. 171-177) and denial upon reconsideration (Tr. 180-191), Winfield requested a

hearing (Tr. 192-194).  On July 19, 2017, a hearing was held before an Administrative Law

Judge ("ALJ").  Tr. 41-66.

On November 24, 2017, the ALJ issued an unfavorable decision (Tr. 13-34), finding that

Winfield had not been under a disability within the meaning of the Social Security Act from May

1, 2015, through the date of the decision (Tr. 17, 28).  Winfield requested review of the ALJ's

decision by the Appeals Council. Tr. 233-235.  On May 18, 2018, the Appeals Council denied

Winfield's request for review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-6.

## II. Evidence

### A.        Personal, educational, and vocational evidence

Winfield was born in 1958 and was 59 years old at the time of the hearing.  Tr. 44, 236.

From July 2015 through the time of the hearing, Winfield indicated that she had experienced

periods of homelessness.  Tr. 57, 59.  At the hearing, Winfield indicated she had a mailing

address that she used but she was "still kind of homeless."  Tr. 59.  Winfield graduated from high

school and has two years of college.  Tr. 44.  She earned a medical administrative assistant

degree.  Tr. 44.  She has past work as a kitchen helper, cleaner/housekeeping, and food service

worker, hospital.  Tr. 44-47, 61.

### B.        Medical evidence[2]

#### 1.  Treatment history

_____

[2] Plaintiff's arguments in this appeal relate to her alleged mental health impairments.  *See* Doc. 13, p. 4.
Accordingly, the medical evidence summarized herein is focused on records relating to those impairments.

On June 3, 2015, Winfield was seen by therapist Jen Lemmer-Graber at Signature Health, Inc. for a mental health diagnostic assessment.  Tr. 371-377.  Winfield relayed that she felt like she was bipolar and had been feeling that way for about three months.  Tr. 371.  She had been unable to find a job and was under a lot of stress because she was facing homelessness.  Tr. 371, 377.  Winfield was living with a friend and trying to find a job.  Tr. 377.  Winfield reported no previous mental health concerns and she was not taking any medications.  Tr. 377.  Ms. Lemmer-Graber diagnosed Winfield with adjustment disorder with anxiety and noted Winfield had both housing and economic problems.  Tr. 372.  Ms. Lemmer-Graber referred Winfield for counseling and case management services.  Tr. 377.

Winfield saw therapist Kathleen Allen for an initial counseling session on June 29, 2015.  Tr. 378-380.  Winfield relayed that she had been very depressed and had been having mood swings since losing her job six months ago.  Tr. 380.  Winfield discussed her frustration and stress associated with her housing situation, her inability to find employment, having been mistreated by her boss while working at Hillcrest Hospital, and being fired.  Tr. 380.  On mental status examination, Ms. Allen observed that Winfield was well groomed; she was cooperative; her eye contact was good; her mood was agitated, constricted, and depressed; and her speech was normal.  Tr. 378.  Ms. Allen felt that Winfield might need an antidepressant so she scheduled Winfield for a psychiatric evaluation.  Tr. 380.

On August 19, 2015, Winfield saw Ms. Allen again.  Tr. 380-383.  At the beginning of her therapy session, Winfield met with the case manager assigned to her case.  Tr. 383.  Winfield was a on a waitlist for a homeless shelter and the case manager noted his willingness to help Winfield with transportation to the shelter once she made it off the waitlist.  Tr. 383.  Winfield had started a job through a temp agency – Winfield liked her supervisor but did not like the

gossip and attitude of her coworkers.  Tr. 383.  Winfield was going to get paid later that week.
Tr. 383.  Winfield relayed that she had filled out a social security disability application because
she was not certain that she would be able to obtain permanent work again.  Tr. 383.  Ms. Allen
instructed Winfield that, once she was in the shelter, she should contact her to schedule an
appointment that would allow for transportation and that would not conflict with Winfield's
work hours.  Tr. 383.

Also, on August 19, 2015, Winfield saw nurse practitioner Rachael Martin for a
psychiatric evaluation.  Tr. 366-370.  Winfield discussed her employment history.  Tr. 369.  She
explained she was single and never married.  Tr. 369.  She had an adult daughter and six-year old
granddaughter.  Tr. 369.  Winfield did not see them often because her daughter was living with
her boyfriend's mother, whom Winfield did not like.  Tr. 369.  Winfield was currently living in
an abandoned home.  Tr. 369.  She had a good friend but could not live with him because of the
maximum occupancy allowed on the lease.  Tr. 369.  Winfield was working at a tea making
company, 8 hours per day, 5 days per week.  Tr. 369.  Nurse Martin observed that Winfield had
adequate attention and concentration; her affect was appropriate; she was depressed but friendly,
pleasant and there was no anxiety; her speech was normal, clear and coherent; her thought
process was logical and relevant and, there were no suicidal/homicidal ideations, ruminations, or
obsessions; she had no abnormal/psychotic thoughts; her fund of knowledge was adequate; her
memory was intact; and her judgment and insight were intact.  Tr. 367.  Nurse Martin diagnosed
Winfield with depressive disorder, not otherwise specified.  Tr. 368, 369.  She prescribed Celexa.
Tr. 368, 369.

Winfield saw Nurse Martin on September 16, 2015.  Tr. 389-392.[3]  Nurse Martin described Winfield's mood and affect as "affect appropriate, euthymic, friendly, pleasant, no anxiety."  Tr. 390.  Winfield's attention and concentration were adequate.  Tr. 390.  Nurse Martin indicated that Winfield's fund of knowledge was below average, her memory was intact, and her judgment and insight were "fair, poor coping, lack of insight to illness."  Tr. 390.  Winfield relayed that things had been okay.  Tr. 391.  However, she explained that the Celexa was causing her to hallucinate.  Tr. 391.  She described problems at work due to the hallucinations.  Tr. 391.  She was seeing things coming off of the boxes and letters floating and she was mispackaging tea bags because she did not think they would fit.  Tr. 391.  Winfield had last taken her Celexa the day before and was not currently having the hallucinations.  Tr. 391.  She was waiting to hear from a temp agency about a possible job.  Tr. 391.

Winfield was interested in transferring her treatment from Signature Health to Care Alliance.  Tr. 429.  On October 23, 2015, Winfield saw Misty Funk, LISW, at Care Alliance for an initial session.  Tr. 436-437.  Winfield reported the following symptoms – anhedonia, anxiety, depressed mood, difficulty concentrating, fatigue, impaired memory, psychomotor retardation, weight gain, decreased concentration, fatigue, sleep disturbance, and uncontrolled worry.  Tr. 437.  On mental status examination, Ms. Funk observed Winfield's affect to be constricted; her mood was depressed; her thought process was within normal limits; her thought content involved depressive cognitions; her speech was within normal limits; and she was cooperative.  Tr. 437.  Ms. Funk discussed with Winfield her current psycho-social stressors, including, loss of employment, no income, and homelessness.  Tr. 437.  A follow-up session was scheduled to continue with Winfield's mental health assessment.  Tr. 437.

---

[3] The September 16, 2015, treatment notes are also located in the record at Tr. 537-540.

Winfield returned to see Ms. Funk for completion of her mental health assessment on October 26, 2015.  Tr. 426-434.  Winfield noted that her daughter and God were her social supports.  Tr. 427.  She also noted having a few close friends.  Tr. 428.  Winfield was single and never married.  Tr. 428.  Her parents had both passed away.  Tr. 427.  In her free time, Winfield indicated she cleans, does laundry, looks for jobs, prays, watches television and spends time with her granddaughter.  Tr. 428.  Ms. Funk's mental status examination reflected a normal mood and affect.  Tr. 433.  Ms. Funk diagnosed major depressive disorder, recurrent episode, moderate with anxious distress and she noted homelessness and extreme poverty as psychosocial and contextual factors.  Tr. 433.  Recommendations included continued counseling.  Tr. 434.

Winfield saw Ms. Funk for an individual counseling session on November 2, 2015.  Tr. 423-424.  Winfield reported continued anxiety about her homeless status and lack of income.  Tr. 423.  Winfield's affect was constricted; her mood, thought process, and speech were within normal limits; her thought content was unremarkable; and her behavior was cooperative.  Tr. 423-424.  Ms. Funk assisted Winfield with prioritizing her goals and addressing her need for housing.  Tr. 424.

Winfield saw Ms. Funk on December 2, 2015, for a behavioral health follow-up visit.  Tr. 418-419.  Winfield reported the following symptoms – anxiety, depressed mood, difficulty concentrating, fatigue, somatic symptoms, restlessness, sleep disturbance and uncontrolled worry.  Tr. 418.  Winfield was in the processing of completing housing applications.  Tr. 418.  Winfield's affect was constricted; her mood, thought process, and speech were within normal limits; her thought content was unremarkable; and her behavior was cooperative, focused.  Tr. 418.  Ms. Funk continued to assess major depressive disorder, homelessness, and extreme poverty.  Tr. 419.  Because Ms. Funk was going to be leaving the agency, Ms. Funk discussed

with Winfield the idea of meeting with another counselor.  Tr. 418-419.  Winfield was not interested.  Tr. 419.

Winfield saw Ms. Funk again on December 9, 2015, and December 16, 2015.  Tr. 442-443, 444-445.  During the December 16, 2015, visit, Winfield relayed that she had completed two housing applications and she was trying to get medication for her mental health symptoms.  Tr. 443.  Winfield was still homeless but she was staying with her daughter and several friends.  Tr. 443.  Winfield's application for SSI had been denied but she had engaged an attorney to advocate for her.  Tr. 443.  On mental status examination, Ms. Funk observed that Winfield's affect was constricted; her mood and thought process were within normal limits; her speech was slowed; her thought content was unremarkable; and her behavior was cooperative.  Tr. 443. Ms. Funk continued to assess major depressive disorder, homelessness, and extreme poverty.  Tr. 443.  Ms. Funk provided Winfield with a referral for Murtis Taylor and recommended that Winfield return in two weeks for a follow-up visit and meet with her primary care physician to discuss medication options for her depression.  Tr. 443.

On February 5, 2016, Winfield saw Crystal Mann, a professional counselor, with Murtis Taylor Human Services for assessment of her depression and anxiety.  Tr. 544-554.  Ms. Mann noted that Winfield had been receiving treatment at Care Alliance but she was interested in treatment closer to home.  Tr. 544.  Winfield relayed that she felt depressed and anxious on a daily basis, noting she had been on medication for a few years to help decrease her symptoms but it caused hallucinations.  Tr. 544.  Winfield reported that she had been unable to keep a job and had no income at the time.  Tr. 544.  While Winfield wanted to work, she did not feel that she was able to work.  Tr. 544.  Winfield was living with her daughter and her daughter was taking care of her until she could get back on her feet.  Tr. 545.  Winfield had some friends that she

talked to from time to time.  Tr. 545.  As far as activities, Winfield relayed that she watches television, visits the library, plays on her phone and does research, cooks, cleans, washes dishes, and reads her Bible.  Tr. 545.  On mental status examination, Ms. Mann observed that Winfield's appearance was unkempt; she reported no delusions or hallucinations; her thought process was tangential and she needed to be redirected at times; her mood was euthymic; her affect was constricted, showing little range of emotion and presenting her history in a very matter of fact manner with little embellishment; Winfield was cooperative but she fidgeted during the session; Winfield had mild impairment in memory, attention and concentration, reporting some difficulty with memory and giving very few details in regard to her history and having difficulty focusing during the session; and she showed little insight into her mental health and was quick to blame others for the problems in her life.  Tr. 549-550.  Ms. Mann noted that Winfield downplayed the severity of her symptoms.  Tr. 552.  Ms. Mann diagnosed bipolar II disorder.  Tr. 544.  Ms. Mann recommended medication management to decrease Winfield's mental health symptoms and regulate her mood and services to assist Winfield with benefits, housing, community resources and support.  Tr. 551.

Thereafter, on March 30, 2016, Winfield saw Dr. Manuel Gordillo, M.D., at Murtis Taylor for a psychiatric evaluation.  Tr. 555-557.  Winfield complained of mood swings.  Tr. 555.  Dr. Gordillo noted that Winfield had been treated with Celexa in the past for a diagnosis of bipolar depression but the medication caused hallucinations.  Tr. 555.  Dr. Gordillo noted Winfield's strengths and assets were "partial insight, future oriented, has place to live, does volunteer work for her church [and] cares for granddaughter while [daughter] works."  Tr. 556.  On mental status examination, Dr. Gordillo observed Winfield's appearance and grooming to be neat and clean; her affect was labile; her mood was depressed; her thought content was coherent;

her speech was soft; she had average intelligence; her concentration was intact; and she had

limited judgment/insight.  Tr. 556.  Dr. Gordillo diagnosed bipolar II disorder and he prescribed

Latuda.  Tr. 555.

Winfield saw Dr. Gordillo for a follow-up medication management visit on April 6, 2016.

Tr. 558-565.  During that visit, Dr. Gordillo observed that Winfield's affect was appropriate; her

speech was clear and distinct; her mood was euthymic; her thought processes/content were

coherent; her judgment and insight were fair; and there were no hallucinations, delusions, or

homicidal ideation.  Tr. 559.  Dr. Gordillo made no changes to Winfield's medication, noting

that her medication was effective.  Tr. 560.

### 2.  Opinion evidence

#### *Consultative examiner*

On November 16, 2015, consultative examiner, Richard N. Davis, clinical psychologist,

examined Winfield.  Tr. 398-405.  Winfield relayed that she was applying for disability benefits

because of physical and emotional problems and she indicated that her depression was caused by

her homelessness and inability to find a job to correct the problem.  Tr. 398.  Winfield discussed

her activities of daily living,[4] indicating that she spent most of her time at her daughter's place.

Tr. 402.  If she is staying at her daughter's, she tries to bathe daily and she helps her daughter,

who is employed, with chores and grocery shopping.  Tr. 402.  Winfield reads the newspaper and

watches about four hours of television each day.  Tr. 402.  She indicated that she liked to

---

[4] During a physical consultative examination conducted by Dr. Robin Benis, M.D., on November 20, 2015, Winfield
discussed her activities of daily living, indicating that:

> She is able to cook seven days a week, clean seven days a week, does laundry once per week, and
> helps take care of her grandchild seven days a week.  She showers seven days a week and dresses
> herself seven days a week.  She can watch TV, listen to the radio, and read . . .

Tr. 408.

volunteer at concerts because she can then see the concert for free.  Tr. 402.  She tries to keep in touch with her friends and tries to attend religious services every week.  Tr. 402.  Winfield indicated that she spends a lot of time at her church.  Tr. 403.  Winfield indicated that, if she had not had her appointment with Dr. Davis, she likely would have attended a political event that day.  Tr. 403.

Dr. Davis noted that Winfield presented with intellectual limitations and seemed restricted in her daily activities.  Tr. 404.  Dr. Davis diagnosed Winfield as having adjustment disorder with mixed anxiety and depressed mood.  Tr. 404.  He provided the following functional assessment regarding Winfield's abilities:

1. DESCRIBE THE CLAIMANT'S ABILITIES AND LIMITATIONS IN UNDERSTANDING, REMEMBERING AND CARRYING OUT INSTRUCTIONS.

   This is an individual who had difficulty in keeping information in mind long enough to deal with the math problems that I was giving her.  I gave her some very easy math problems and she couldn't even deal with those successfully.

2. DESCRIBE THE CLAIMANT'S ABILITIES AND LIMITATIONS IN MAINTAINING ATTENTION AND CONCENTRATION AND MAINTAINING PERSIST[E]NCE AND PACE TO PERFORM SIMPLE TASKS AND TO PERFORM MULTI-STEP TASKS.

   She seemed to be paying attention and concentrating but then when I would ask her if she was going to try and solve the problems, she would ask me to repeat them.  I suspect that this behavior is what got her let go from as many jobs as she says she has had and loses.  She seemingly is able to perform at simple repetitive tasks.  In the job that she had at Hillcrest she worked in food service.  This was where she was accused of stealing a burrito.

3. DESCRIBE THE CLAIMANT'S ABILITIES AND LIMITATIONS IN RESPONDING APPROPRIATELY TO SUPERVISION AND TO CO-WORKERS IN A WORK SETTING.

   She apparently has difficulty getting along with supervisors, saying that they constantly pick on her.

4.  DESCRIBE THE CLAIMANT'S ABILITIES AND LIMITATIONS IN RESPONDING APPROPRIATELY TO WORK PRESSURES IN A WORK SETTING.

She didn't seem to be having difficulties dealing with the stresses and pressures in my office but says that certain work settings were uncomfortable places for her to be because of not being able to get along with the supervisors.

Tr. 403-404.

*State agency reviewers*

On December 3, 2015, state agency reviewing psychologist Bruce Goldsmith, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 114)[5] and Mental RFC Assessment (Tr. 117-119).[6]  In the PRT, Dr. Goldsmith opined that Winfield had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintain concentration, persistence, or pace.  Tr. 114.  He found no repeated episodes of decompensation, each of extended duration.  Tr. 114.  In the Mental RFC, Dr. Goldsmith opined that Winfield retained the ability to complete simple 1-3 step tasks; sustain attention, concentration, persistence, and pace to perform routine tasks that do not require fast-paced performance or have strict production quota requirements; interact in situations that do not require more than superficial contact, resolving conflicts, or working directly with the general public; she can work in an environment where duties are fairly static and changes can be easily explained.  Tr. 117-119.

[5] Dr. Goldsmith's PRT is also located at Tr. 129.

[6] Dr. Goldsmith's Mental RFC Assessment is also located at Tr. 132-134.

Upon reconsideration, on February 24, 2016, state agency reviewing psychologist Joseph Edwards, Ph.D., completed a PRT (Tr. 144-145)[7] and Mental RFC Assessment (Tr. 148-150).[8] Dr. Edwards reached the same opinions as Dr. Goldsmith.

## C.     Evidence upon which Winfield seeks a sentence six remand

On July 19, 2017, Dr. Gordillo completed a Medical Source Statement-Mental Capacity. Tr. 67-69.  In her brief, Winfield asserts that, on the same day as the hearing, July 19, 2017, Dr. Gordillo faxed the statement to Plaintiff's counsel at about 4:10 p.m., and Plaintiff's counsel filed Dr. Gordillo's July 19, 2017, statement with the SSA on July 21, 2017.  Doc. 13, pp. 12-13.

In the statement, Dr. Gordillo offered his opinions regarding Winfield's functional abilities, opining that Winfield had no limitations in asking for help when needed and no limitations in ignoring or avoiding distractions while working.  Tr. 68-69.  Dr. Gordillo opined that Winfield had mild limitations in recognizing a mistake and correcting it; initiating and performing a task that she understands and knows how to do; and changing activities or work settings without being disruptive.  Tr. 68-69.  Dr. Gordillo opined that Winfield had moderate limitations in understanding and learning terms, instructions or procedures; following 1 or 2 step oral instructions to carry out a task; asking and answering questions and providing explanations; identifying and solving problems; handling conflicts with others; stating own point of view; initiating or sustaining conversation; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; working close to or with others without interrupting or distracting them; working a full day without needing more than the allotted number of length of rest periods during the day; responding to demands; adapting to changes;

---

[7]  Dr. Edwards' PRT is also located at Tr. 158-159.

[8] Dr. Edwards' Mental RFC Assessment is also located at Tr. 162-164.

setting realistic goals; maintaining personal hygiene and attire appropriate to a work setting. Tr. 69-69.  Dr. Gordillo opined that Winfield had marked limitations in describing work activity to someone else; sequencing multi-step activities; using reason and judgment to make work related decisions; cooperating with others; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction and challenges; working at an appropriate and consistent pace; completing tasks in a timely manner; managing one's psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; making plans for oneself independent of others; and being aware of normal hazards and taking appropriate precautions.  Tr. 68-69.  Dr. Gordillo opined that Winfield had extreme limitations in sustaining an ordinary routine and regular attendance at work.  Tr. 69.

When asked to state Winfield's diagnosis and the medical and clinical findings supporting the assessment, Dr. Gordillo stated: "Bipolar II Disorder.  Client struggles with periods of depression and anxiety that cause her difficulty in life.  Client reported difficulty following directions and getting along with others that has caused her to lose many jobs."  Tr. 69.

**D.  Hearing testimony**

**1.  Plaintiff's testimony**

Winfield testified and was represented at the hearing.  Tr. 43-61.  The ALJ asked Winfield what happened on May 1, 2015 – the date she alleges she became disabled.  Tr. 47. Winfield explained that her knees started hurting, she started getting back pain, and she is unable to keep a job, which she thinks might be related to her mood swings.  Tr. 47, 58.  Employers have generally not provided her with reasons for letting her go.  Tr. 58-59.  They just tell her not to return.  Tr. 59.  Winfield indicated that Dr. Gordillo from Murtis Taylor has told her that she is bipolar.  Tr. 47-48.

Winfield discussed conflict that she has had in the past with a boss when she was working at Hillcrest Hospital.  Tr. 48, 49.  Her boss disrespected her and used an obscenity when referring to her and called her an idiot.  Tr. 48, 49, 55, 56.  Winfield wanted to respond back and hit him but she held back from doing so.  Tr. 55.  She addressed the sexual harassment at work but stated that she ended up getting fired anyway.  Tr. 49.  She had the most problems with her boss at Hillcrest.  Tr. 49.  She also felt disrespected at other jobs based on the way that she was talked to at times.  Tr. 49.  If treated decently, Winfield indicated that her mood swings do not come out.  Tr. 50.  Winfield could not recall an instance when she verbally or physically lashed out at someone in the workplace for disrespecting her.  Tr. 55-56.  She used to have altercations with individuals in her personal life.  Tr. 56.  The last time was about a year prior to the hearing.  Tr. 56.

Winfield was taking Latuda for her bipolar disorder.  Tr. 48.  It had been working okay for her but she had not been taking her medication because she lost her medication.  Tr. 48.  Winfield indicated she needed to return to see Dr. Gordillo.  Tr. 48.  She indicated that her case had been closed at Murtis Taylor and she was planning on returning later that day to Murtis Taylor to see Dr. Gordillo.  Tr. 48, 58.

Winfield has one grandchild who was 8 years old at the time of the hearing.  Tr. 50.  A typical day for Winfield involves waking up, brushing her teeth, washing up, getting dressed, getting something to eat and going to temp agencies to try to get a job.  Tr. 50.  Winfield explained that she has to go to a temp agency because, after the 90-day probationary period, she gets fired.  Tr. 50-53, 58.  She was fired from a steel cutting job after she was injured at work[9] and filed a workers' compensation claim.  Tr. 51.  She was fired from a housekeeping job at the

---

[9] She was using a stapler and it went through her thumb and she had to seek treatment at the hospital.  Tr. 51.

hospital.  Tr. 52.  She was informed that she was not cleaning a room fast enough.  Tr. 52.  Other

than her boss at Hillcrest calling her an idiot, Winfield could not recall any employer telling her

that she had difficulty understanding instructions or following instructions.  Tr. 56-57.

### 2.     Vocational expert's testimony

Vocational Expert Paula Zinsmeister ("VE") testified at the hearing.  Tr. 61-65.  The VE

described Winfield's past work, explaining that the kitchen helper job was an SVP 2,[10] medium

level job; the cleaner housekeeping job was an SVP 2, light level job; and the food service

worker, hospital job was an SVP 2, medium level job.  Tr. 61.

The ALJ asked the VE a series of hypothetical questions.  First, he asked the VE to

assume a hypothetical individual Winfield's age and education and with her work experience

who can lift/carry 35 pounds occasionally and 25 pounds frequently; stand/walk six out of eight

hours; sit six out of eight hours; no limit on ability to push/pull or use foot pedals; frequently use

a ramp or stairs; only occasionally use a ladder, rope, or scaffold; frequently balance, stoop,

kneel, crouch and crawl; no manipulative, visual or communication limitations; no

environmental limitations; can perform simple, routine tasks but no complex tasks; tasks should

be low stress, meaning no high production quotas, no piece rate work, no work involving

arbitration, confrontation, negotiation, supervision, or commercial driving; should have only

superficial interpersonal interactions with supervisors, meaning no more than five minutes at a

time for a definite purpose.  Tr. 61-62.  The VE indicated that the described individual would be

able to return to Winfield's work as a kitchen helper and cleaner but would not be able to

---

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

perform the food service worker job because it involves work on a conveyor belt and there would be a strict production goal.  Tr. 62.  The VE also indicated that there would be jobs, other than the two identified past jobs, that the described individual could perform, including (1) linen room attendant, an SVP 2, medium level job; (2) cook helper, an SVP 2, medium level job; and (3) store laborer, an SVP 2, medium.[11]  Tr. 62-63.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical with the additional limitation that the individual would be off pace 20% of the time as compared to other workers.  Tr. 63.  The VE indicated that, if the individual was off pace at that rate on a consistent basis, the limitation would be work preclusive.  Tr. 63.

Winfield's counsel asked the VE to consider the first hypothetical but to add to it the following limitations – all work instructions would have to initially be demonstrated to the individual, the individual could have no contact with the public, and only superficial interaction with coworkers (as described for supervisors).  Tr. 63.  The VE indicated that her answer to the first hypothetical would not change.  Tr. 64.  Winfield's counsel then asked whether limiting the individual's contact with coworkers to no greater than five minutes at a time and for a definite purpose would change the VE's numbers at all.  Tr. 64.  The VE indicated that those limitations would not change her answers.  Tr. 64.  Lastly, Winfield's counsel asked the VE to assume the ALJ's first hypothetical but to also assume that the individual was limited to light, unskilled employment and would have to be redirected occasionally (one-third of the day) on a consistent basis.  Tr. 64-65.  With those limitations, the VE indicated that there would be no jobs available.  Tr. 65.

---

[11] State and national job incidence data was provided for each of the identified jobs.  Tr. 62-63.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

> capable of performing other work that exists in significant numbers in the
> national economy.

20 C.F.R. § 404.1520;[12]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107

S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

### IV. The ALJ's Decision

In his November 24, 2017, decision, the ALJ made the following findings:[13]

1.  Winfield meets the insured status requirements of the Social Security Act through September 30, 2018.  Tr. 18.

2.  Winfield has not engaged in substantial gainful activity since May 1, 2015, the alleged onset date.  Tr. 19.  Winfield worked after the alleged onset date but the work activity did not rise to the level of substantial gainful activity.  Tr. 19.

3.  Winfield has the following severe impairments: dysfunction of major joints/osteoarthritis; disorders of the back, discogenic and degenerative; and affective disorder.  Tr. 19.  Winfield has the following non-severe impairment: diabetes mellitus type 2.  Tr. 19.

4.  Winfield does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 19-21.

5.  Winfield has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) except she can do simple, routine tasks, but no complex tasks; tasks should be low stress, meaning no high production quotas or piece rate

---

[12] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[13] The ALJ's findings are summarized.

work, no work involving arbitration, confrontation, negotiation, or supervision, and no commercial driving; she can only have superficial interpersonal interactions with supervisors and "superficial" means no more than 5 minutes at a time and for a definite purpose.  Tr. 21-26.

6.    Winfield is capable of performing past relevant work as a kitchen helper and cleaner/housekeeper.  Tr. 26-27.

7.    Winfield was born in 1958 and was 57 years old, defined as an individual of advanced age, on the alleged onset date.  Tr. 27.

8.    Winfield has at least a high school education and is able to communicate in English.  Tr. 27.

9.    Transferability of job skills is not an issue.  Tr. 27.

10.   In the alternative, considering Winfield's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Winfield can perform, including linen room attendant, cook helper, and store laborer.  Tr. 27-28.

Based on the foregoing, the ALJ determined that Winfield had not been under a disability, as defined in the Social Security Act, from May 1, 2015, through the date of the decision.  Tr. 28.

### V. Plaintiff's Arguments

Winfield argues that (1) the ALJ erred in not considering the report of Dr. Gordillo; (2) the ALJ erred in evaluating the opinions of the state agency reviewing psychologists because the ALJ did not incorporate the entirety of their opinions into the RFC; and (3) a sentence six remand is warranted for consideration of the report submitted by Dr. Gordillo.  Doc. 13, pp. 12-20.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.**  **The Court should find that the ALJ did not err by declining to consider Dr. Gordillo's July 19, 2017, medical source statement**

Winfield argues that the ALJ erred by declining to consider Dr. Gordillo's July 19, 2017, medical source statement, submitted by Winfield's counsel to the Social Security Administration ("SSA") on July 21, 2017.  She asserts that her counsel diligently sought to introduce Dr. Gordillo's statement in a timely manner and therefore the ALJ should have considered the statement.

In his decision, the ALJ indicated that he was declining to admit evidence submitted on July 21, 2017, and August 17, 2017,[14] because the requirements of 20 C.F.R. §§ 404.935(b) and 416.1435(b) had not been met.  Tr. 16.  The cited regulations require a claimant to submit or inform the ALJ about evidence no later than five business days before the date of the scheduled hearing.  20 C.F.R. § 404.935(b).  If that deadline is missed, an ALJ will accept the evidence if he has not issued a decision and the claimant did not inform him about or submit the evidence before the deadline because "[s]ome other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented [her] from informing [the SSA] about or submitting the evidence earlier."  20 C.F.R. § 404.935(b)(3).[15]  Examples of "[s]ome other unusual, unexpected, or unavoidable circumstance[s]" include: (1) serious illness that prevented claimant from contacting the SSA; (2) death or serious illness in the claimant's immediate family; (3) important records were destroyed by an accidental cause; or (4) claimant actively and diligently sought evidence from a source and that evidence was not received or was received less than 5 business days prior to claimant's hearing.  20 C.F.R. § 404.935(b)(3)(i)-(iv).

Winfield asserts that, because Dr. Gordillo's statement was authored the same date as the hearing, it did not exist and they could not have been submitted or informed the SSA about the evidence five business days prior to the hearing.  Further, she asserts that her counsel acted diligently in requesting and submitting Dr. Gordillo's statement as soon as practicable, which occurred two days after issuance of Dr. Gordillo's statement and receipt by Winfield's counsel, and two days after the hearing.  Thus, Winfield contends that she has shown that some unusual,

---

[14] Additional records were submitted after the hearing.  Doc. 13, p. 14 (referencing May 30, 2017, MetroHealth Medical Center records).  Winfield does not challenge the ALJ's decision not to consider these records.

[15] Other reasons set forth in the regulation for seeking to excuse late submission of evidence are (1) action by the SSA misled the claimant; or (2) the claimant had some physical, mental, educational or linguistic limitations that prevented the claimant from informing the SSA about or submitting the evidence earlier.  20 C.F.R. § 404.935(b)(1)-(2).

unexpected, or unavoidable circumstance beyond her control prevented her from informing the SSA about the evidence and the ALJ should have considered Dr. Gordillo's July 19, 2017, statement.

Notwithstanding Winfield's arguments, the record reflects that Winfield saw Dr. Gordillo in March and April of 2016.[16]  Tr. 555-557, 558-565.  Yet, she fails to explain why she was unable to obtain a medical statement from Dr. Gordillo until July 19, 2017, the date of the hearing, and more than a year after having seen Dr. Gordillo.  The undersigned concludes that waiting more than a year to obtain a medical statement from a physician whom Winfield contends was her treating psychiatrist does not demonstrate active and diligent efforts to seek evidence from a medical source.  Additionally, although Winfield indicated during the hearing that she was scheduled to see Dr. Gordillo later that day (Tr. 58), at the close of the hearing, when the ALJ indicated that he was closing the record (Tr. 65), there was no objection and there was no indication that additional evidence from Dr. Gordillo was forthcoming.

Considering the foregoing, the undersigned recommends that the Court find that the ALJ did nor err in declining to consider the July 19, 2017, statement from Dr. Gordillo based on her failure to meet the requirements of 20 C.F.R. § 404.935(b).

**B.** **The Court should find that the ALJ did not err with respect to the opinions of the state agency reviewing psychologists**

Winfield argues that the ALJ erred in evaluating the opinions of the state agency reviewing psychologists because the ALJ did not incorporate the entirety of their opinions into the RFC.   She asserts that, although the state agency reviewing psychologists' opinions

---

[16] The ALJ considered the March and April 2016 treatment notes from Winfield's visits with Dr. Gordillo.  Tr. 25.

contained limitations with respect to interaction with coworkers and the public, the RFC does not include those limitations.[17]

Since Drs. Goldsmith and Edwards did not have an ongoing treatment relationship with Winfield, their opinions are not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490-491 (6th Cir. 2005).   Further, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*   "Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).  And, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

---

[17] Winfield appears to take issue with the ALJ defining the meaning of "superficial" as it related to the limitation regarding interaction with supervisors (Doc. 13, p. 17) but she does not develop an argument as to this point.

In reaching his decision, the ALJ considered and weighed the opinions of Drs. Goldsmith and Edwards, stating:

> Bruce Goldsmith, Ph.D., and Joseph Edwards, Ph.D., reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services, on December 3, 2015 and February 24, 2016, respectively. Both consultants expressed the opinion that the claimant can complete simple 1-3 step tasks; retains the ability to sustain attention, concentration, persistence, and pace to perform routine tasks that do not require fast-paced performance or have strict production quota requirements; can interact in situations that do not require more than superficial contact, resolving conflicts, or working directly with the general public; and she can work in an environment where duties are fairly static and changes can be easily explained (1A, 2A, 5A, and 6A).

> Overall, I give considerable weight to their opinions because of their area of specialty. However, I have not adopted the part of the opinion about no work directly with the public because the claimant does volunteer work and she expressed an interest in working with children.  Instead, I find the claimant should only have superficial interpersonal interactions with supervisors even though the claimant could only identify one boss that was disrespectful to her.

Tr. 26.

Winfield recognizes that an ALJ may accept or reject some or all of a physician's opinion.  However, she asserts that the ALJ must provide some reasonable basis for rejecting a portion of the opinion and contends that the ALJ's stated reasons for rejecting portions of the state agency reviewing psychologists' opinions amounts to no reason at all.  In making her argument, she seeks to have this Court consider the evidence de novo, which is not the role of this Court.  *Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.")  Here, the ALJ sufficiently explained his reasons for not including the reviewing psychologists' restrictions regarding interaction with the public and Winfield has not shown that the reasons provided are unsupported by substantial evidence.

Winfield also takes issue with the fact that the ALJ's RFC limits interaction with supervisors but not with coworkers and provides no reason for not limiting interaction with coworkers.  However, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *Smith*, 2013 WL 1150133, * 11.  Additionally, during the hearing, the VE was asked whether jobs would remain available to the worker described in the ALJ's hypothetical if there could be no contact with the public and if contact with coworkers could be no more than five minutes at a time and for a definite purpose (similar to the supervisor limitation) and the VE indicated that his original response would not change, i.e., there would be jobs available.  Tr. 63-64.

In sum, while the ALJ did not adopt the opinions of Drs. Goldsmith and Edwards verbatim, as noted above, the ALJ was not required to.  Additionally, Winfield has not demonstrated that the RFC assessment is unsupported by substantial evidence.

Considering the foregoing, the undersigned recommends that the Court find that Winfield has not shown reversible error based on the ALJ not adopting and/or not explaining why each limitation in the reviewing psychologists' opinions was not incorporated into the RFC.

## C.  The Court should find that a sentence six remand is not warranted for consideration of Dr. Gordillo's medical source statement

Winfield argues that reversal and remand is warranted under sentence six of 42 U.S.C. § 405(g) because the Appeals Council was in receipt of Dr. Gordillo's July 19, 2017, statement but did not consider it.

The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).

The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it can consider such evidence only in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)

The plaintiff has the burden under sentence six of 42 U.S.C. §405(g) to demonstrate that the evidence she now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceedings.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material."). Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted and emphasis supplied).  "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*  (internal quotations and citations omitted and emphasis supplied).

Even assuming that Dr. Gordillo's July 19, 2017, medical source statement is "new" evidence, as explained below, Winfield has not demonstrated that it is "material" or that there was "good cause" for not acquiring and presenting the evidence for inclusion in the hearing for the ALJ.

In arguing that the statement is "material," Winfield simply asserts in a conclusory fashion that given the "nature – and timing –" of the medical source statement it "is obviously material[.]"  Doc. 13, p. 20.  However, given the fact that Dr. Gordillo only saw Winfield twice and those visits occurred more than two years prior to the issuance of the medical source statement on July 19, 2017, the evidence is not "obviously material."

Additionally, Winfield has not demonstrated "good cause" for not acquiring and presenting the evidence for inclusion in the hearing before the ALJ.  As discussed above in Section VI.A, the record reflects that Winfield saw Dr. Gordillo in March and April of 2016.  Tr. 555-557, 558-565.  Yet, Winfield waited more than a year to obtain a medical statement from Dr. Gordillo and she provides no explanation as to why she waited to do so.

Considering the foregoing, the undersigned recommends that the Court find that Winfield has failed to meet her burden of showing a basis for a sentence six remand.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

July 16, 2019

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).